# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KANSAS CITY, MISSOURI EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | Civil Action No. 1:16-cv-4005 |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CITIGROUP, INC.; CITIBANK, N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO.; GOLDMAN SACHS BANK USA; GOLDMAN SACHS FINANCIAL MARKETS, L.P.; GOLDMAN SACHS INTERNATIONAL; HSBC BANK PLC; HSBC BANK USA, N.A.; HSBC SECURITIES (USA) INC.; ICAP CAPITAL MARKETS LLC; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN SECURITIES PLC; MORGAN STANLEY; MORGAN STANLEY BANK, N.A.; MORGAN STANLEY & CO. LLC; MORGAN STANLEY CAPITAL SERVICES LLC; MORGAN STANLEY DERIVATIVE PRODUCTS INC.; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY BANK INTERNATIONAL LIMITED; THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND PLC; RBS SECURITIES INC.; TRADEWEB MARKETS LLC; UBS AG; AND UBS SECURITIES LLC, | |
| Defendants. | |

Plaintiff brings this action for treble damages and injunctive relief on behalf of a class of all persons and entities who entered into interest rate swap transactions with Defendants in the United States during the period January 1, 2007, through the present.

## OVERVIEW OF THE CASE

1.      Plaintiff in this antitrust class action challenges Defendants' unlawful and anticompetitive conduct in the market for interest rate swaps ("IRS"). IRS are a type of derivative instrument that investors use to hedge against fluctuations in interest rates or to speculate on the direction of rates. In the most common type of IRS transaction, for a fixed amount of principal (the "notional" amount) and a fixed period of time, one party will agree to pay its counterparty a fixed rate of interest in exchange for a floating, market-based rate.

2.      IRS serve as an important portfolio management device for pension funds, municipalities, corporations, hospitals, counties, and other types of institutional investors, a group collectively known as the "buy-side" of the IRS market. Buy-side customers use these instruments principally to exchange their floating rate obligations or risks for fixed market rates, or vice versa.

3.      The global market for IRS is massive, with hundreds of trillions of dollars of notional value outstanding and over $1 trillion traded on a daily basis.

4.      Defendants Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS (the "Bank Defendants") are the primary incumbent dealers of IRS in the United States and, collectively, dominate the market. Known as the "sell-side" of the industry, the Bank Defendants serve as the largest IRS market makers, i.e., the primary dealers willing to enter either side of an IRS transaction with a customer.

5.      Historically, IRS transactions have been executed on an over-the-counter ("OTC") basis, that is, through direct bilateral negotiations between a dealer (typically, one of the Bank Defendants) and a buy-side entity. In an OTC transaction, the buyer must contact a dealer directly to

obtain a "quotation" or price, which the buyer must then accept or reject on the spot. This framework was highly favorable for the banks because OTC trading, by its nature, limits the buy-side's ability to comparison shop using real-time price information. It also entrenched the Bank Defendants as necessary parties to the vast bulk of trades, enhancing their collective market power.

6.     OTC markets generally lack the price transparency and resulting competitiveness found in electronic exchange-style trading platforms, in which a centralized exchange serves the market- making function of accepting bids and offers from anonymous market participants (including buy-side entities) to match willing buyers and sellers at a competitive real-time price.

7.     In recent years, many financial products, including derivative instruments, have migrated from OTC to exchange-style execution, with substantial benefits for competition and consumers because of the extent to which exchange-style trading improves price discovery and liquidity while eliminating traditional market makers (i.e., the Bank Defendants) as rent-seeking intermediaries.

8.     In this case, Plaintiff challenges Defendants' efforts to preclude or delay the development of exchange-style trading for IRS by using their collective market power to exclude rivals and new entrants from the marketplace. In particular, Defendants boycotted and collusively targeted several new electronic trading platforms that would have allowed direct and/or anonymous comparison-shopping and IRS execution for the buy-side. These would-be competitors, which offered an exchange-like platform for executing standardized IRS transactions, would have delivered significant efficiency benefits and better prices for buy-side customers (i.e., the proposed class) while eroding a traditional profit center worth billions of dollars per year to Defendants.

9.     As described below, Defendants conspired together to preclude that nascent competition.   Their unlawful conduct included, inter alia: (i) using group boycotts and anticompetitive agreements to prevent the development and rollout of exchange-like trading

2

platforms open to the buy-side; (ii) using group boycotts and other anticompetitive agreements to prevent existing inter-dealer electronic trading platforms from making their systems available to buy-side users; and (iii) retaliating against end-user customers that attempted to circumvent the traditional OTC trading system.

10.     Because of their collusive exclusion of competition, Defendants have been able to maintain tight control of the IRS market and as a result were able to charge supracompetitive prices for IRS transactions to members of the proposed class during the period 2007 through the present.

## JURISDICTION AND VENUE

11.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages, injunctive relief, and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries Plaintiff and other Class Members have suffered as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337(a), as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

13.     Venue is proper in the Southern District of New York pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c), and (d), because during the class period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

14.     All Defendants are subject to personal jurisdiction in the United States because the alleged conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiff and Class Members residing in, located in, or doing business throughout the United States, including within the Southern District of New York. In addition, many of the Defendants are incorporated in and/or have their principal place of business in, and/or did substantial

volume of IRS business in, the United States and this District.

15.    The anticompetitive activities of Defendants were directed towards this District and had a substantial effect in this District and on its residents.

## PLAINTIFF

16.    The Kansas City, Missouri Employees' Retirement System ("KCMERS") was established by Kansas City ordinance, and provides retirement and other benefits to full-time and retired employees of Kansas City, Missouri and their beneficiaries. KCMERS currently holds nearly $1 billion in net assets for the benefit of approximately 5,640 members.  During the class period, KCMERS entered into IRS transactions directly with one or more Bank Defendants. As a result, KCMERS was injured by Defendants' unlawful and anticompetitive conduct.

## DEFENDANTS

17.    Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. Defendant Bank of America, N.A. ("BANA"), a wholly owned subsidiary of Bank of America Corporation, is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina. On January 1, 2009, BAC acquired Merrill Lynch & Co., Inc.

18.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. MLPFS is a wholly owned subsidiary of Bank of America Corporation. In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC").

19.    The term "Bank of America" includes all Bank of America affiliates identified in the

4

preceding paragraph, as well as their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, which entered into IRS contracts with the Class, including as a dealer. During the class period, Bank of America directly sold IRS to and bought IRS from Class Members. Bank of America also was a shareholder of Tradeweb during the class period.

20.     Defendant Barclays PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, and is a wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly owned subsidiary of Barclays Bank PLC. Barclays Capital Inc. is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

21.     The term "Barclays" includes Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. During the class period, Barclays directly sold IRS to and bought IRS from Class Members. Barclays also was a shareholder of Tradeweb during the class period.

22.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of France, with its principal place of business in Paris, France and branch locations in the United States. Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, and is a wholly owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP SA. BNPP Securities is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

23.     The term "BNPP" includes Defendant BNPP SA, BNPP Securities, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. BNPP directly sold IRS to and bought IRS from Class Members during the class period.

5

24.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Citibank N.A. ("Citibank") a wholly owned subsidiary of Citigroup, is a federally chartered national banking association with its principal place of business in New York, New York. Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, and is a wholly owned subsidiary of Citigroup Financial Products Inc., whose ultimate parent is Citigroup. In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC and as a FCM with the CFTC. Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.

25.     The term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Inc., Citigroup Global Markets Limited, as well as their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc. that entered into IRS contracts with the Class, including as a dealer. Citi directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

26.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware, and is a wholly owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG. In addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

27.     The term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Credit Suisse transacts business in Chicago, Illinois and maintains a Chicago office. Credit Suisse directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

28.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG. Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

29.     The term "Deutsche Bank" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., as well as their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Deutsche Bank directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

30.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Goldman Sachs & Co. is registered as a broker-dealer with the SEC and as a FCM with the CFTC. Defendant Goldman Sachs Bank USA, a wholly owned subsidiary of Goldman Sachs Group, is a New York state-chartered bank and a member of the Federal Reserve System, with its principal place of business in New York, New York. Defendant Goldman Sachs Financial Markets, L.P. a wholly owned subsidiary of Goldman Sachs Group, is a corporation organized and existing

7

under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs International, another wholly owned subsidiary of Goldman Sachs Group, is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.

31.    The term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, as well as their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Goldman Sachs directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

32.    Defendant HSBC Bank PLC is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant HSBC Bank USA, N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia. Defendant HSBC Securities (USA) Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Defendant HSBC Securities (USA) Inc. is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

33.    The term "HSBC" includes Defendants HSBC Bank PLC, HSBC Bank USA, N.A., HSBC Securities (USA) Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. During the class period, HSBC directly sold IRS to and bought IRS from Class Members.

34.     Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey. As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities. In the IRS market, ICAP acts as an inter-dealer broker, brokering IRS trades between dealers. As explained below, ICAP agreed with the Bank Defendants that it would not allow its platform to be accessed by the buy-side of the IRS market.

35.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which, in turn, is a subsidiary of J.P. Morgan Chase & Co. J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC and as a FCM with the CFTC. Defendant J.P. Morgan Securities Plc, a wholly owned subsidiary of J.P. Morgan Chase & Co., is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England.

36.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities Plc; and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. JP Morgan directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

37.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah, and is a wholly owned subsidiary of Morgan Stanley Delta Holdings LLC, the ultimate parent of which is MS. Defendant Morgan Stanley & Co. LLC ("MS&C") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is MS. In addition, MS&C is registered as a broker-dealer with the SEC and as a FCM with the CFTC. Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is MS. Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of MS. Defendant Morgan Stanley & Co. International plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a subsidiary of Morgan Stanley UK Group, the ultimate parent of which is MS. Defendant Morgan Stanley Bank International

Limited is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Morgan Stanley International Holdings Inc., the ultimate parent of which is MS.

38.     As used herein, the term "Morgan Stanley" includes Defendants MS; Morgan Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; Morgan Stanley Bank International Limited, and their subsidiaries and affiliates, including Morgan Stanley Capital Group Inc. and Morgan Stanley Capital Products LLC, that entered into IRS contracts with the Class, including as a dealer. Morgan Stanley directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

39.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland. Defendant RBS Securities Inc., a wholly owned subsidiary of RBS PLC, is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut. RBS Securities Inc. is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

40.     The term "RBS" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. RBS directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

41.     Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. As used herein, the term "Tradeweb" includes Tradeweb

Markets and its subsidiaries and affiliates that acted as providers of trading services for IRS, CDS, and other asset classes. Tradeweb is jointly owned by Thomson Reuters and a consortium of Wall Street Dealers (the Bank Defendants other than BNPP), with the Bank Defendants exercising control over Tradeweb. As explained below, the Bank Defendants took control of Tradeweb to prevent it from developing an electronic trading platform that would have opened the IRS marketplace to competition and lower prices for buy-side customers, and further used their joint control of Tradeweb as a means to coordinate other aspects of the conspiracy. Tradeweb is and was an instrument of the conspiracy.

42.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut. Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, and is an indirect wholly owned subsidiary of UBS AG. UBS Securities LLC is registered as a broker-dealer with the SEC and as a FCM with the CFTC.

43.     The term "UBS" includes Defendant UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. UBS directly sold IRS to and bought IRS from Class Members during the class period, and was a shareholder of Tradeweb.

44.     Defendants took actions in furtherance of the conspiracy within this District and directed actions at this District in furtherance of the conspiracy.

## **BACKGROUND**

**Interest Rate Swaps**

45.     An IRS is a type of derivative financial instrument, meaning a contract linked to the future value of another asset or benchmark. They are the most basic and common type

of swap, and often involve one party paying the other party a fixed rate in exchange for a floating rate. For IRS, the relevant rates to which payments are benchmarked are interest rates.

46.     The notional value of the swap and its duration are designated in advance, as is the benchmark to which the floating rate will be pegged – typically a market benchmark such as the London Interbank Offered Rate or "LIBOR".

47.     In addition to hedging, IRS are also used to speculate on the future direction of rates.

48.     Initially, transaction costs for IRS were high, as they were negotiated and recorded on a trade-by-trade basis. In 1987, the industry adopted the International Swaps and Derivatives Association ("ISDA") Master Agreement, which began a wave of standardization of trades. Since at least the early 2000s, standardized terms and contracts have governed most IRS transactions, which has resulted in lower transaction costs and higher volumes.

49.     As transactions have become more standardized, the IRS market has seen massive growth. According to the CFTC, the total outstanding notional value of all IRS is over $250 trillion.[1]

**Transacting Interest Rate Swaps**

50.     Traditionally, as the IRS market developed in the 1980s and 1990s, buy-side customers executed IRS transactions on an ad hoc OTC basis, meaning customers would contact a dealer such as a Bank Defendant to request a price quote (in technical terms, a "bid"/"ask" quote) for a particular swap. By policy and custom, the Bank Defendants

---

[1] CFTC, "Gross Notional Outstanding – Interest Rate (Millions of USD)," http://www.cftc.gov/MarketReports/SwapsReports/L2IRSGrossExp (accessed May 26, 2016).

typically required the immediate acceptance or rejection of the quoted price terms, which, in light of rapid interest rate movements in the marketplace, made it difficult for customers to comparison shop effectively among dealers.

51.     Moreover, competition for IRS was also limited by requirements upon customers to enter into ISDA Master Agreements with their banking counterparties. These ISDA Masters served as a prerequisite to entering into swaps with Bank Defendants and helped ensure that only the largest buy-side participants had access to a broad swath of potential counterparties.

52.     Owing to this market structure, OTC derivative sales and trading became a highly lucrative profit center for the Bank Defendants. The opaque nature of the OTC market, the practice of requiring immediate acceptance of quoted swap terms, and the need for a bilateral ISDA Master before entering into a swap allowed dealers to inflate IRS prices (known technically as the "bid/ask spread" or "spread") without buy-side customers having an effective way to obtain competitive quotes on a real-time basis. This inability to shop around for competitive quotes has allowed Bank Defendants to widen the spread, resulting in more money to the Bank Defendants at the expense of Plaintiff and members of the proposed class.

53.     The OTC framework also entrenched the Bank Defendants as the dominant sell-side dealers. By the early 2000s, the Bank Defendants were leading "market makers" for IRS and served as a party to the overwhelming majority of IRS transactions executed in the United States.

54.     In time, however, the IRS market became increasingly ripe for a shift away from the traditional OTC model in favor of electronic, exchange-like execution and clearing − a system of trading that increases transparency and fosters real-time competition and

significantly lower spreads.

55.     Economists, regulators, and market participants recognize that exchange-style systems deliver considerable efficiency benefits relative to OTC-style execution. Many financial products have migrated from OTC to exchanges over the years − equity options and currency transactions being two examples − with corresponding (and often dramatic) compression of spreads resulting from increased price transparency and competitive pricing.

56.     Indeed, when trading among themselves, the Bank Defendants recognize the advantages of exchange-style trading. The Bank Defendants routinely execute a considerable volume of inter-bank IRS business through platforms characterized by many of the pro-competitive features of an exchange, including (i) the ability to view multiple simultaneous quotes from dealers, (ii) automatic matching of bids and offers at the best available price, and (iii) immediate execution. These platforms are commonly referred to as "central limit order books" ("CLOB"). Contrast these features with the OTC-like options available to buy-side customers. The inter-bank market is thus more efficient − with considerably tighter spreads − than the "retail" market in which buy-side firms are forced to transact. In other words, CLOB trading results in more competition, and in turn lower "prices" in the form of tighter spreads.

57.     This two-tiered system enabled the Bank Defendants to enjoy the competitive benefits of transparent, liquid, exchange-like trading platforms in their inter-dealer transactions, while preserving the inefficiency, lack of competition, and high profits (resulting from larger spreads) in their transactions with the buy-side. The preservation of these inefficiencies on the buy-side is not a coincidence, but is instead the result of concerted efforts between the Bank Defendants.

58.     As described in more detail below, this case is about Defendants' collusive

efforts to prevent buy-side customers from executing IRS transactions through more efficient and competitive means. Absent the alleged conspiracy, buy-side IRS business would have migrated to electronic exchanges or exchange-like platforms accessible to buy- and sell-side entities alike (a so-called "all-to-all" platform), improving the overall efficiency of the market while eroding Defendants' market power and profits. There is no pro-competitive justification for Defendants' collective action to forestall this development of the marketplace.

## DEFENDANTS' MARKET POWER

59.    Overall, the U.S. derivatives market is highly concentrated; as of the end of 2015, just four Defendants—JP Morgan, Citi, Goldman Sachs, and Bank of America—controlled over 90% of the entire market, which has a notional value of almost $180 trillion.[2] Within the market for IRS, together the Bank Defendants are the largest dealers, with collective control of approximately 70% of the market for IRS transacted within the United States.[3]

60.    Defendants JP Morgan, Goldman Sachs, Deutsche Bank, Citi, and Barclays are the dealers for approximately 65% of buy-side transactions in IRS, with other Bank Defendants handling much of the balance.

61.    The Bank Defendants also possessed market power with respect to other IRS market participants, including but not limited to firms involved in brokerage, execution, communication, clearing, and trade documentation services (including but not limited to inter-dealer brokers, buy-side sales and trading platforms, SEFs, clearinghouses, exchanges such as CME, and trade organizations such as ISDA).

---

[2] *See* OCC, "Quarterly Report on Bank Trading and Derivatives for Third Quarter 2015," *available at* http://www.occ.gov/topics/capital-markets/financial-markets/derivatives/dq415.pdf.
[3] *Id.*

62.     The buy-side of the market, in contrast, is non-concentrated, consisting of thousands of customers of varying size, type, and sophistication.

63.     Barriers to entry are high. Beyond the capital, regulatory, intellectual property, and technology barriers associated with launching an electronic trading platform for IRS, Defendants themselves stand as significant (and often insurmountable) barriers to entry. That is, because of the incumbent dealers' market power − including the ability to restrict access to the inter-dealer segment of the market and their collective leverage over every material aspect of IRS execution, clearing, and market infrastructure − no firm or electronic platform was able to enter the IRS market to compete effectively for buy-side business during the class period.

64.     The IRS products at issue are standardized, commodity-like products, in that the terms and conditions of one Bank Defendant's IRS can be substituted readily for the same IRS offered by another Defendant. Moreover, most IRS transactions are governed by standard form ISDA contracts. As a result, buy-side consumers typically make IRS purchasing decisions based principally on price and, accordingly, would benefit substantially from exchange-style electronic trading of IRS instruments.

## ANTICOMPETITIVE CONDUCT

65.     Defendants engaged in two broad categories of anticompetitive conduct aimed at blocking exchange-style execution for buy-side users of IRS. First, they used group boycotts and other anticompetitive conduct to crush upstart IRS platforms that threatened to disrupt the status quo. Second, they used group boycotts and other anticompetitive conduct to prevent existing inter-dealer trading platforms from allowing buy-side access.

**Collective Action to Block Upstart Exchange-Style Platforms**

66.     Prior to 2007, several features of the IRS market made it suitable for

exchange-type execution. First, as discussed at *supra* ¶¶ 50-51, the terms of most IRS have become highly standardized, effectively commoditizing the IRS industry. Second, this standardization and corresponding increase in market demand led to exponential IRS volume growth over time, with the size of the market increasing more than fivefold (i.e., by hundreds of trillions of dollars) between 2000-2008. And finally, in order to accommodate this volume, technology and electronic trading platforms evolved to enable efficient, exchange-like execution of IRS business in the inter-dealer segment of the market, that is, in the Bank Defendants' IRS transactions with each other (as distinct from their "retail" business with buy-side customers).

67.     Thus, by 2007, there was no reason for the continued domination of OTC trading, and in fact the market was primed for the introduction of exchange-type trading of IRS.

68.     Sensing this void, in 2007, a trading platform known as Tradeweb (owned at the time by Thomson Reuters) had positioned itself as a potential exchange-style swaps platform that would be available to buy-side customers. However, Tradeweb's promise never came to fruition. Recognizing the threat, the Bank Defendants used their collective market power to stop Tradeweb in its tracks.

69.     The Bank Defendants' plan was twofold. First, they agreed to purchase Tradeweb, so that they could control what features were available to the market. Second, they agreed to avoid other trading platforms that supported all-to-all exchange trading.

70.     In order to take over Tradeweb, Bank Defendants Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, Morgan Stanley, RBS, and UBS joined together in an effort called "Project Fusion"[4] to take control of Tradeweb governance. According to

---

[4] *See* Ivy Schmerken, "Breaking News: Thomson Plans to Spin Off TradeWeb" (Oct. 10, 2007),

contemporaneous news sources, the purpose of the deal was to "allow the banks to exercise more control over trading rules" on Tradeweb going forward.[5]

71.    By asserting their collective leverage in this fashion, the Bank Defendants also secured a majority of Tradeweb board seats while stacking Tradeweb's governance committees with hand-picked current and former employees, guaranteeing that Tradeweb posed no risk to their OTC business and profits in the future. For example, Lee Olesky, the former COO for Credit Suisse, was selected to serve as CEO of Tradeweb, and a Goldman Sachs Managing Director, Vic Simone, became the Chairman of Tradeweb's Board of Directors. Mr. Simone was later succeeded by Brad Levy, another Goldman Sachs employee.

72.    Over time, other Board of Directors members included:

    a.    Bank of America – Nicholas Brophy, Head of the Americas Core Rates Trading (later, Head of Rates Trading in the Americas for Citi); Luke Halestrap, Head of Emerging Markets Interest Rates; David Moore, Head of North America Rates Trading; Shea Wallon, Managing Director in the Strategic Investments Group;

    b.    Barclays – Andrew Challis, Head of eFICC Distribution and Market Strategic Investments; Dexter Senft (who left Barclays in 2010 to become a Managing Director at Morgan Stanley and Global Head of Fixed Income e-Commerce);

    c.    Credit Suisse – Timothy Blake, Head of Interest Rates Trading in the United States; Sean Flynn, Global Head of Investment Banking Strategy;

    d.    Deutsche Bank – Michele Faissola, Head of Global Rates; Stephen Wolff, Head of Fixed Income e-Commerce, Head of Interest Rates Trading;

    e.    Goldman Sachs – Colin Corgan, partner on the Rates Desk;

    f.    JP Morgan – Kemal Askar, Head of Rates Trading in the United States; Simon Maisey, Head of Global Rates e-Commerce and Market Structure; Christopher Paul Wilcox, Global Head of Rates Trading, Head of Global Rates Strategic Investments;

---

http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992?
[5] Reuters, "Nine Banks to Buy Minority Stake in Tradeweb: WSJ," CNBC (Oct. 11, 2007), http://www.cnbc.com/id/21237643

g.  Morgan Stanley – in addition to Dexter Senft, David Moore, Global Head of Structured Interest Rates;

h.  RBS – Michelle Neal, Global Head of Electronic Markets, Co-Head of FICC Prime Services; Richard Volpe, Global Head of Dollar Interest Rates; and

i.  UBS – Paolo Croce, Head of European Rates; Joan Lavis, Global Head of Strategic Investments; Stuart Taylor, Head of Global eBusiness in Fixed Income.

73.    In addition, the Tradeweb takeover allowed the Bank Defendants to meet regularly (under the auspices of Tradeweb governance) to coordinate similar collective strategies aimed at preserving the bifurcated structure of the swaps market. Employees and agents of the Bank Defendants met in Board and committee meetings as well as informally to coordinate efforts to prevent competitive exchange-type platforms from gaining traction.

74.    Bank Defendants used their control of Tradeweb to prevent the development of an all-to-all exchange in 2009. In April 2009, Tradeweb had entered the mortgage bond market with a trading platform known as Dealerweb, which cut heavily into its competitor ICAP's business in that market; in six weeks, ICAP had lost 85% of its business to Dealerweb.[6] In response, ICAP made overtures that it would bring its exchange platform i-Swap, which was already in development for the European IRS market, to the United States.[7] As the Bank Defendants were well aware, ICAP could enable i-Swap as an all-to-all exchange platform for IRS that could have included the buy-side; thus the Bank Defendants viewed ICAP and i-Swap as serious potential threats to their supracompetitive profits.

75.    The Bank Defendants' solution was to use Tradeweb as a bargaining chip with ICAP. On information and belief, the Bank Defendants used Tradeweb to reach an

---

[6] Gwen Robinson, "ICAP loses 85% of mortgage bond trading," FINANCIAL TIMES (Apr. 21, 2009), http://ftalphaville.ft.com/2009/04/21/54906/icap-loses-85-of-mortgage-bond-trading/.

[7] Michael MacKenzie, "Rate swap traders wait for no man," FINANCIAL TIMES (Oct. 19, 2010), http://www.ft.com/intl/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html#axzz49m914ons

agreement with ICAP to avoid the introduction of i-Swap in the United States. Under that agreement, ICAP agreed to refrain from launching an all-to-all swap trading platform, while Tradeweb agreed to refrain from expanding into ICAP's traditional business in the inter-bank segment of the swaps market. This naked market allocation scheme (which was against Tradeweb's economic self-interest, given its immediate success after introducing Dealerweb in the mortgage bond market) served the conspiracy's broader goal of eliminating the threat of all-to-all exchanges while maintaining the strict bifurcation of buy-side and sell-side trading for IRS.

76.     Defendants engaged in similar conduct with respect to the Chicago Mercantile Exchange ("CME"). CME is the world's leading exchange-based marketplace for derivatives and, as such, was uniquely positioned to launch a viable all-to-all trading platform (and clearinghouse) for IRS. Indeed, CME planned to do just that.

77.     In 2006, CME acquired an electronic swaps trading platform known as Swapstream and announced plans to introduce dollar-denominated swaps as a Swapstream product. By July 2007, CME was prepared to offer centrally "cleared" IRS trading (via Swapstream) starting in early 2008 on a platform designed to provide "unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[8] CME, in other words, was prepared to implement exchange-style trading for IRS.

78.     CME also took concrete steps to secure the participation of the buy-side, announcing in February 2008 that "33 buy-side participants have committed to an Early

---

[8] CME Group, "CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants" (July 17, 2007), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

Adopter Program (EAP) for CME Swaps on Swapstream, the first centrally-cleared interest rate swaps available to all over-the-counter (OTC) market participants . . . . The firms, representing a wide spectrum of US, European and Middle Eastern financial institutions, will lead the effort to bring this new and innovative product to the $271 trillion interest rate swap (IRS) market. They will be the first financial institutions to benefit from the balance sheet and operational efficiencies through central counterparty clearing and straight through processing, offered by CME Swaps on Swapstream. The new participants include banks, mortgage banks, asset managers, hedge funds and proprietary trading firms[.]"[9]

79.     CME was thus on the brink of a Swapstream rollout that, for the first time, would have allowed the buy-side to bypass the Bank Defendants and execute IRS on an efficient and competitive exchange. The Bank Defendants boycotted Swapstream, however, using their collective market power to kill the plan.

80.     Bank Defendants employed similar measures to thwart the implementation of all-to-all trading through an entity known as LCH.Clearnet.

81.     LCH.Clearnet is a clearinghouse − a market intermediary that guarantees a transaction or trade for each counterparty. Clearinghouses improve market liquidity essentially by eliminating counterparty credit risk.

82.     Clearinghouses also (for similar reasons) can be used to facilitate anonymous exchange-style execution for financial products because, with counterparty risk eliminated, parties are secure in their ability to transact anonymously on electronic real-time markets, including through automatic matching of competitive bids and offers on an exchange.

---

[9] "Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap," PR Newswire (Feb. 4, 2008), http://www.prnewswire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

83.     Defendants understood, however, that clearinghouse systems − including the SwapClear platform operated by LCH.Clearnet − could easily evolve into an all-to-all exchange for IRS. SwapClear, for example, was an established clearinghouse used to process a significant volume of IRS transactions in the years leading up to 2008. Accordingly, the Bank Defendants worked together to take and exercise control over LCH.Clearnet to prevent any expansion into all-to-all trading.

84.     In particular, when an independent entity known as the Depository Trust & Clearing Corporation ("DTCC") announced in October 2008 that it had signed a preliminary merger agreement with LCH.Clearnet, the Bank Defendants worked together to block the deal to stop DTCC and Swapstream from developing an integrated all-to-all swaps platform.

85.     The Bank Defendants did so by orchestrating a group consortium bid to acquire LCH.Clearnet, which forced DTCC to withdraw its offer. At that point, with DTCC out of the picture, the Bank Defendants and Defendant ICAP were able to take control of LCH.Clearnet through a share buyback plan that gave "large users" (i.e., principally the Bank Defendants) a 63% ownership stake, thereby satisfying the Bank Defendants' desire for "control of LCH.Clearnet largely for its SwapClear interest rate swaps clearing business."[10]

86.     Defendants continued to exercise their control throughout the relevant period by installing employees on LCH.Clearnet's board and blocking the development of any trading and clearing platform that would have enabled all-to-all execution of IRS.

**Involvement in Comparable Collusive Misconduct**

87.     The conduct described above − a pattern of systematic group boycotts and other anticompetitive activity aimed at blocking electronic exchange-style trading platforms

---

[10] Jeremy Grant, LCH.Clearnet Streamlines Ownership Structure, FINANCIAL TIMES (Nov. 6, 2009), http://www.ft.com/intl/cms/s/0/9279e7fa-cac5-11de-97e0-00144feabdc0.html#axzz40O Nwi7CL.

accessible to buy-side customers − is strikingly similar to Bank Defendants' conduct in the market for swaps known as credit default swaps ("CDS").

88.    As in the IRS market, the Bank Defendants traditionally served as the dominant dealers in over-the-counter sales and trading of CDS.

89.    Like here, with respect to CDS, the Bank Defendants worked together systematically to block the development of exchange-style platforms for buy-side customers. This conduct resulted in antitrust investigations by the Department of Justice and the European Commission ("EC"). As the EC has explained in announcing its preliminary conclusion that Bank Defendants had infringed EU competition rules with respect to CDS, "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[11]

90.    The CDS case arose from incumbent dealer banks (including Bank Defendants) boycotting an upstart exchange being developed by the CME Group (a platform known as CMDX). In particular, the CMDX platform was preparing to launch in 2008 and would have allowed CDS market participants to interact directly with each other and bypass the Bank Defendants through all-to-all trading. But the Bank Defendants killed the plan.

91.    In CDS, the dealers allegedly conspired to prevent the CMDX platform from securing necessary licenses from two bank-controlled entities, namely, the ISDA trade organization and an entity known as Markit. The scheme worked and CMDX never got off the ground, after which a series of antitrust class actions was filed against ISDA, Markit, and most of the Bank Defendants concerning their alleged exclusionary conduct. Those cases

---

[11] EC Press Release, "Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation" (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

recently settled for $1.86 billion and injunctive relief.

92.     The Bank Defendants' pattern of conduct is easily defined. When the Bank Defendants' OTC profits were threatened by exchange-style platforms − whether for CDS or IRS − the banks used their market power to work together to systematically crush these more efficient, buy-side-friendly rivals.

**Defendants' Collective Action to Deny Buy-Side Access to All-to-All SEFs**

93.     It is widely recognized that derivatives were an important contributing factor to the 2008 financial crisis.  The opacity of the derivatives market, brought upon by collusion between the Bank Defendants to preserve the status quo, stifled competition that could have reduced the systemic risk that brought down the U.S. economy.  As the country recovered from the Great Recession, Congress decided to act to bring transparency to the swaps market.

94.     In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"). Through Dodd-Frank, Congress wanted to ensure that swaps could be traded on open, competitive platforms, like other products such as futures and equities. As the CFTC has explained, the legislative history "reveals a Congressional expectation that, over time, exchange trading of swaps would reduce transaction costs, enhance market efficiency, and counter the ability of dealers to extract economic rents from higher bid/ask spreads at the expense of other market participants." See 17 C.F.R. Part 37 (June 4, 2013).

95.     As one industry group explained, "[t]his regulatory mandate is designed to support the principle that swaps… benefit from market-wide, pre-trade transparency."[12] But that market evolution has yet to occur in meaningful fashion, principally because Defendants

---

[12] Haleel Sarwar, "Buy Side Needs Better SEF Data," TABB FORUM (April 29, 2014), http://tabbforum.com/opinions/buy-side-needs-better-sef-data.

blocked any meaningful change to the status quo in the market for IRS.

96.     Dodd-Frank correctly recognized the need for the transparency and competition fostered by all-to-all exchanges, and called for the migration of OTC swaps business to exchange-like platforms known as swap execution facilities ("SEFs"). The idea behind SEFs was that exchange trading would increase pre-trade transparency by enabling market participants to view all available prices across the market, and also to lower trading costs through increased competition as other providers could enter the market.

97.     And the market was primed for the introduction of SEFs.  Just a couple of years ago, it was estimated that "40 to 50 firms could end up competing for swaps execution business."[13] As of October 2013, there were almost 20 platforms in what the Economist called a "newly competitive market"[14], including Thomson Reuters, ICAP, tpSEF (owned by Tullett Prebon), INFX, Tradition, 360 Trading Networks, TruEX, IXE Swap Trade, Javelin, BGC Derivative Markets, TeraExchange, SwapEx, GFI, TW and DW (owned by Tradeweb), MarketAxess, and Bloomberg.[15]

98.     All of this potential competition did not sit well with the Bank Defendants. So, the Bank Defendants *again* conspired to preserve the status quo by exercising control over buy-side access to SEFs and preventing other market developments that would have led to real-time exchange-type competition for buy-side business.

99.     Defendants also used their market power to threaten and retaliate against buy-side entities that attempted to participate in the type of competitive, exchange-style swap

---

[13] Mike Kentz, *SEF Start-ups Face Obstacles*, INT'L FIN. REV. (July 22, 2013), http://www.ifre.com/sef-start-upsface-obstacles/21099200.article.

[14] "Not With a Bang", Economist (Oct. 5, 2013), *available at* http://www.economist.com/news/finance-and-economics/21587231-chaotic-launch-set-electronic-trading-platforms-not-bang.

[15] Terry Flanagan, "SEF Competition Seen as Keen," MARKETS MEDIA (October 10, 2013), http://marketsmedia.com/sef-competition-seen-keen/.

execution contemplated by Dodd-Frank. Defendants were determined to make sure that no SEF could succeed.

100.    The experience of three SEFs is illustrative. By 2013, after Dodd-Frank regulations were implemented, several SEFs were preparing to launch electronic platforms for buy-side and sell-side execution and clearing of swaps. Three in particular − TeraExchange, trueEX, and Javelin − were focused on creating all-to-all platforms, or integrated exchange-style execution platforms for both buy- and sell-side users. Defendants thwarted all three SEFs from gaining a foothold.

101.    TeraExchange, for example, developed an SEF platform designed to facilitate anonymous electronic trading of IRS and other swaps that would be open to buy- and sell-side users alike. TeraExchange also worked with CME to create a system for central clearing, lending CME credibility to the venture. But when the Bank Defendants learned that several major buy-side entities intended to participate in the TeraExchange platform, they took action to stop the exchange.

102.    First, Bank Defendants ordered their FCMs to block trades on TeraExchange, or else to quote astronomically high fees that would make a trade on TeraExchange impractical. Salespersons from the Bank Defendants also threatened customers using TeraExchange with loss of liquidity in IRS or other products.

103.    Second, the Bank Defendants collectively boycotted TeraExchange, starving it of liquidity.

104.    Bank Defendants did this with the intention of putting TeraExchange out of business; they even went so far as to tell TeraExchange that its platform would never succeed. These actions had their intended effect. TeraExchange never got off the ground with an all-to-all SEF, and eventually shifted its focus to bitcoin derivatives.

105.    trueEX, the first SEF approved by the CFTC in the wake of Dodd-Frank, suffered the same fate. By 2013, trueEx was prepared to bring the competitive benefits of exchange-style anonymous trading and central clearing to buy-side users of IRS. But when trueEX began touting its plans to include a significant number of buy-side entities on the platform, the Bank Defendants, as with TeraExchange, collectively boycotted trueEx and destroyed its viability. Today, trueEX is a minor player in the market and does not allow anonymous exchange-style trading for the buy-side.

106.    Bank Defendants took similar efforts with respect to Javelin. Starting as early as 2010, Javelin was preparing to launch an all-to-all SEF aimed at attracting buy-side swap volume, and in September 2013 the CFTC granted temporary registration to Javelin to operate as an SEF.

107.    Javelin sought buy-in from the Bank Defendants, as a means of ensuring liquidity on its platform. So, around the time of its registration, Javelin met with Goldman Sachs executives, who interrogated Javelin regarding whether it would allow all-to-all trading. Goldman Sachs also tried to learn the identity of buy-side customers who had signed up for Javelin, ostensibly to pressure them out of participating in the platform.

108.    After the meeting, Javelin continued to solicit participation from the Bank Defendants. But the Bank Defendants (except for RBS, for a short period of time) refused to trade on or provide liquidity to Javelin, and their Futures Commission Merchants (agents of each Bank Defendant) participated in additional sabotage, including refusing to clear trades of provide credit checks, effectively preventing buy-side customers from using the platform.

109.    The Bank Defendants accordingly boycotted the platform and pressured buy-side customers into doing the same. The results of this group boycott are clearly evidenced

in the below chart, depicting monthly percentages of dealer-to-client trades on the Javelin platform[16]:



110.    Through Defendants' group boycott, Javelin went from a promising increase in percentage of dealer-to-client trades to zero market share within less than a year.

111.    Both Javelin and TeraExchange have since filed lawsuits against the Bank Defendants based on their collusive action. Each lawsuit makes allegations consist with the allegations herein, including that Bank Defendants used their market power to starve SEFs of liquidity and shut them out from the IRS market.

112.    In all three instances, the Defendants used their collective market power to strong-arm potentially viable SEFs, ensuring that Plaintiffs would not have the opportunity to participate in the kind of transparent and competitive trading that the Defendants themselves enjoyed on the dealer side. The Defendants even went so far as to collectively

---

[16] Jack Delany, "Collusion in the Interest Rate Swap (IRS) Market?" (Nov. 30, 2015), *available at* http://fideres.com/publications/collusion-in-the-interest-rate-swap-irs-market.

agree that they would not clear trades on any of the three platforms, a decision that went directly against the self-interest of each Defendant. And in each instance, they were successful in preventing each platform from getting off the ground in any meaningful way.

113.    Despite Defendants' efforts to starve out the SEFs mentioned above, and because Dodd-Frank mandated the development of SEFs for swaps and derivatives, several viable SEFs ultimately became operational. Examples include ICAP (which, as of March 2016, handles 37.5% of total SEF volume in IRS), Tullett Prebon (24.9%), Bloomberg (8.0%), Tradition (approximately 6.2%), BGC (approximately 5.4%), and Tradeweb, through TW (7.9%) and DW (.7%).[17] These and other SEF platforms handle a significant volume of inter-dealer swap transactions, as well as (in certain cases) transactions from the buy-side.

114.    To continue to extract supracompetitive profits from blocking or delaying true all-to-all exchanges, Defendants had to engage in additional collusive activity in order to block the benefits of SEFs on the back end. They carried this out through imposing trading rules throughout the marketplace (including for SEF platforms) designed to entrench the status quo.

115.    One example concerns the imposition of so-called Request for Quote ("RFQ") protocols on SEF platforms, protocols that, in substance, make SEF trading no different than traditional OTC execution for the buy-side portion of the market.

116.    RFQ means that when a buy-side entity wishes to execute an IRS transaction through an SEF, its order is processed not by real-time exchange-style matching of competitive bids and offers, but rather by the buy-side firm requesting a transaction-specific

---

[17] Market share data from March 2016, obtained from FIA's SEF Tracker, *available at* https://fia.org/file/3391/download?token=6ZweFR6QOAiZPNeV6e0yubZAlJKa3-bs4t8x24mz5Hs.

quote from a dealer—just as in a standard OTC encounter. In this way, the dealers preserve the essential features of the OTC market for buy-side business. Meanwhile, the dealers are able to trade among themselves on exchange-style SEF platforms with no such competitive restraints. Because RFQ is effectively OTC by another name, the bifurcated market remains in place.

117.    An even simpler and most effective impediment has been the practice of post-trade counterparty disclosures, or "name give-up".

118.    Name give-up is an SEF protocol under which parties to IRS transactions must disclose their identities to counterparties, which allows the dealers to police the parties trading on various SEF platforms (including inter-dealer platforms) to ensure that no buy-side entities are permitted to trade on the more competitive inter-dealer platforms and, instead, are confined to the less competitive RFQ process.

119.    Name give-up has no practical purpose, and in fact can cause significant harm to market participants by inviting retaliation. As such, requiring name-give up can discourage participation in exchange-like platforms such as SEFs.  Even CFTC Chairman Timothy Massad has questioned the reason for SEF's requiring name give-up: "We have heard market participants express concern about potential negative consequences of this practice with respect to its effects on liquidity and participation, and I have not heard a compelling justification for it."[18]

120.    Together, RFQ and name give-up rules have reinforced the bifurcation of the IRS market even in the post-Dodd-Frank era, and Defendants have maintained this division through a series of unlawful collective means, including (i) boycotts and threats of boycotts

---

[18] Remarks of Chairman Timothy Massad before the ISDA 30th Annual General Meeting (April 23, 2015), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad---17.

to ensure that RFQ and name give-up rules remain in place, (ii) collectively directing inter-dealer trade volume to SEFs that imposed RFQ and name give-up restraints on buy-side participants, and (iii) punishing buy-side firms that attempted to trade anonymously on inter-dealer SEFs.

121.    For example, when an SEF platform known as GFI proposed anonymous trading in 2014, GFI received "heated" phone calls from executives at JP Morgan and Credit Suisse, forcing GFI to scrap its plans for anonymous exchange-style trading.[19] When GFI said "it would allow anonymous trading, several banks threatened to pull their business off the platform, according to people familiar with the matter. GFI reversed course."[20] Another market observer concluded that any venue "that goes anonymous is sending a signal that the buyside is becoming part of its platform. You'll get wider spreads or even dealers withdrawing from that platform."[21]

122.    Other SEFs suffered a similar fate, including TeraExchange, trueEX, and Javelin, all three of which were boycotted (as described *supra* ¶¶ 102-112) for proposing platforms with alternative rules and/or anonymous all-to-all execution.[22]

123.    That Bank Defendants are engaging in collective action is further suggested by now-public acknowledgements that "market participants" have engaged in other direct

---

[19] *See* Katy Burne, "CFTC to Propose Swaps Anonymity," WALL ST. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[20] Charles Levinson, "Startup challenges Dominance of Big Banks in Derivatives Markets," REUTERS (Mar. 10, 2015), http://www.reuters.com/article/markets-derivatives-exchange-insight- gra-idUSL1N0WB2D520150310.

[21] Kim Hunter, "Growing Pains," MARKIT (Winter 2014), http://content.markitcdn.com/corporate/Company/Files/MagazineEntireIssue?CMSID=1277525d e02549adbf7b422b9b34f641).

[22] It is not the case that name give-up is justified on the grounds − sometimes advanced by dealers − that it is a necessary tool for assessing the creditworthiness of a counterparty. Instead, because exchange-style trading (including many SEFs) typically is coupled with central "clearing," counterparty risk is eliminated because the clearinghouse, not the counterparty, guarantees each side of the trade. In today's world of electronic exchange-style execution and central clearing − both of which are employed by all manner of established derivative exchanges (including SEF platforms) − the practice of name give-up serves the purposes of policing Defendants' conspiracy but little else.

threats and retaliation to deter buy-side entities from making markets on SEF platforms. Indeed, in April 2015, CFTC Commissioner Timothy Massad reported that SEFs platforms were reluctant to offer anonymous trading "because of potential retaliatory action by other market participants."[23]

124.    As a result of their collective action, Bank Defendants have successfully stymied the promise of the Dodd-Frank reforms and fended off the threat of anonymous, all-to-all trading of IRS products.  SEFs have been unsuccessful in increasing competition in the market for IRS, as evidenced by the lack of any significant compression in bid-ask spreads after their introduction[24]:



---

[23] Remarks of Chairman Timothy Massad before the ISDA 30th Annual General Meeting (April 23, 2015), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad---17.

[24] Jack Delany, "Collusion in the Interest Rate Swap (IRS) Market?" (Nov. 30, 2015), *available at* http://fideres.com/publications/collusion-in-the-interest-rate-swap-irs-market.

## DEFENDANTS' INDEPENDENT COMPETITIVE INTEREST

125.    Absent a conspiracy, the individual interests of many different IRS market participants, including Defendants, interdealer brokers, clearinghouses, and SEFs, were to offer an all-to-all trading platform to the buy-side. And indeed, multiple platforms were developed to allow this type of trading.  But for Defendants' collusive conduct, such a platform would have invited the Bank Defendants to participate competitively in a marketplace to gain market share and access to a broader pool of buy-side participants. Absent participation in the conspiracy, Defendants would have thus had incentive to increase their own market share of the IRS market with lower prices, by either creating or participating in such an all-to-all exchange based platform.

## ANTICOMPETITIVE EFFECTS

126.    Exchange trading of derivatives typically leads to improved efficiency, transparency, and competitive prices for end-use consumers.

127.    In the market for IRS, by contrast, such benefits are enjoyed by Defendants in their inter-dealer transactions but not by the buy-side.

128.    Because of the conduct alleged in this Complaint, buy-side firms paid supracompetitive prices (i.e., spreads) for an extraordinary volume of IRS transactions during the relevant period.

129.    The Bank Defendants, in turn, reaped supracompetitive profits as a result of their actions. While concrete profit data is not available for the Bank Defendants' IRS operations, it is likely that Class Members suffered billions of dollars of overcharges.

130.    JP Morgan, for example, stated in 2012 that it typically earned $350 million per quarter from its IRS business.[25]

---

[25] *See* Michael J. Moore, "JPMorgan Says Credit, Swaps Among Trading Revenue Leaders," Bloomberg

131.   Similarly, Bloomberg reported in 2014 that the risk of the IRS business "stepping into the light" would cost JP Morgan an estimated "$1 billion to $2 billion in revenue a year."[26]

132.   As an industry source quoted by Bloomberg explained: "People's bonuses are tied up in that . . . This has been a very good business for the dealers for a very long time."[27]

## EQUITABLE
## TOLLING

133.   Plaintiff incorporates by reference the allegations each preceding and succeeding paragraph of this Complaint as though fully set forth herein.

134.   By its nature, the conspiracy alleged herein was self-concealing because Defendants conspired through secret activities, communications, and conduct to manipulate the IRS market without detection.

135.   The very nature of the IRS industry − an opaque and traditionally OTC marketplace in which the Bank Defendants maintained tight control over all aspects of buy-side business − operated to conceal Defendants' activity vis-à-vis buy-side Class Members.

136.   Defendants also engaged in affirmative acts of concealment, including but not limited to market statements that led Class Members and others to believe that IRS prices were the product of competitive market conditions rather than Defendants' collusive and anticompetitive conduct, as well as non-disclosure and/or intentional cover-up of the conspiratorial activity at issue.

137.   For example, Defendants implemented their conspiracy, in part, through

_____

(Feb. 28, 2012) ("JPMorgan Chase & Co. said interest-rate swaps and credit are among the biggest source of revenue in its trading businesses, as it broke with most U.S. rivals by releasing a breakdown typically kept secret."), http://www.bloomberg.com/news/articles/2012-02-28/jpmorgan-says-credit-swaps-lead-trading-revenue-sources-in-rare-breakdown.

[26] Matthew Leising, "A Safer Way to Trade Interest Rate Swaps," BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes- out-of-the-shadows.

[27] *Id.*

nonpublic meetings of the Tradeweb board of directors. Defendants also met regularly (and privately) in connection with numerous IRS industry groups, associations, and consortia, which allowed Defendants to coordinate their efforts on a highly confidential basis, in many cases protected by non-disclosure agreements. Defendants even developed code names for certain of these collective projects and consortia.

138.   Defendants likewise met regularly in person and communicated by telephone, email, instant messaging, and Bloomberg messaging in connection with their conspiratorial activity, none of which was accessible to Plaintiff and the Class.

139.   Defendants also concealed their conspiracy by their practice of retaliating against market participants that threatened to disrupt the status quo. Had entities involved in IRS sales and trading not faced the demonstrable risk of retaliation by the dominant sell-side dealers, the conspiracy could have been revealed long ago.

140.   Because of these active steps of concealment, including fraudulent concealment, Plaintiff and the Class did not discover and could not have discovered through reasonable due diligence that they were injured by Defendants' conspiracy during the class period.

141.   Accordingly, Defendants are equitably estopped from asserting any otherwise applicable limitations period.

## CLASS ACTION ALLEGATIONS

142.   Plaintiff brings this action as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and all others similarly situated. The Class is defined as:

> All "buy-side" persons or entities which engaged in IRS transactions directly with Bank Defendants (or their subsidiaries and/or affiliates), between January 1, 2007 and the present. Excluded from the class are

defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, as well as federal government entities (including the Court and any members of the Court's immediate family).

143.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Plaintiff believes that at least tens of thousands of geographically dispersed Class Members purchased and/or terminated IRS during the relevant period.

144.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising from Defendants' common course of conduct in violation of the antitrust laws as alleged herein.

145.    The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the antitrust laws as alleged herein.

146.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

147.    Plaintiff and its counsel have sufficient financial resources to adequately and vigorously litigate this class action. Plaintiff can and will fairly and adequately represent the interests of the Class and has no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

148.    Numerous questions of law and fact are common to the Class, including, but not limited to:

   a.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to allocate the IRS market between and among themselves, thereby inflating prices associated with the purchase and sale of IRS in the

United States, in violation of the Sherman Act;

b.      the identity of the participants in the conspiracy;

c.      the scope and duration of the conspiracy;

d.      the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

e.      whether Defendants' conduct injured Plaintiff and Class Members;

f.      whether Defendants fraudulently concealed the conspiracy's existence from Plaintiff and Class Members;

g.      whether Defendants' manipulations caused the prices of IRS to be artificially high;

h.      the appropriate injunctive and equitable relief for the Class; and

i.      the appropriate measure of damages sustained by Plaintiff and Class Members.

149.    Common questions of law and fact predominate over any questions affecting only individual Class Members.

150.    A class action is superior to separate, individual litigations for the fair and efficient adjudication of this controversy. It will enable a large number of similarly situated persons to adjudicate common claims simultaneously and efficiently. It will eliminate the costly duplication of thousands of repetitive individual litigations and will eliminate the risk of inconsistent or varying adjudications.

151.    Class treatment will allow for the adjudication of claims by many Class Members that would not otherwise be amenable to efficient or affordable resolution.

152.    The Class is readily ascertainable. Class Members can be identified in the files of Defendants, the public record, or Class Members' own documents.

153.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## CLAIM ONE
(Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)

154.    Plaintiff incorporates by reference the allegations in each preceding and succeeding paragraph of this Complaint as though fully set forth herein.

155.    Beginning at least as early as January 1, 2007, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into and engaged in a conspiracy to boycott and otherwise exclude from the marketplace entities that would have introduced competition for buy-side IRS business in the United States, including but not limited to all-to-all exchanges in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

156.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, or stabilized artificial prices, as alleged herein.

157.    Defendants' conspiracy constitutes an unreasonable, per se violation of the federal antitrust laws and, moreover, lacked any procompetitive justification.

158.    Defendants' conspiracy occurred within the flow of interstate commerce and substantially affected interstate commerce.

159.    Defendants' conspiracy caused substantial anticompetitive effects and injury to members of the proposed class. Plaintiff incorporates by reference the allegations in each preceding and succeeding paragraph of this Complaint as though fully set forth herein.

## CLAIM TWO
(Unjust Enrichment)

160. Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff and members of the Class. Defendants knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiff and Class Members by manipulating the IRS market, in conscious and/or reckless disregard of Plaintiff's and Class Members' rights.

161. Defendants were unjustly enriched because they charged Plaintiff and Class Members more for IRS than they would have otherwise received absent Defendants' collusion.

162. Class Members have no adequate remedy at law for these unjust and misappropriated gains. The Court should issue an order compelling Defendants to disgorge all unlawful or inequitable proceeds, and all monies that Defendants unjustly retained that should have been paid to Plaintiff and Class Members. Plaintiff and Class Members are also entitled to rescission of the transactions or rescissory damages.

163. The banks worked in concert and conspired to exclude competitors from the IRS market in order to enable the continued charging of supracompetitive prices. The conspiracy allowed all Defendants to profit at the expense of Plaintiff and Class Members.

164. All Defendants committed numerous overt acts in furtherance of the conspiracy and agreement. Defendants acted with malice, and intended to injure Plaintiff and Class Members.

165. Each Defendant was aware of the conspiracy and acted in furtherance of its objectives.

166. Plaintiff and Class Members seek restoration of the monies that Defendants unfairly and improperly took from them.

## **PRAYER FOR RELIEF**

Plaintiff demands the following relief:

A.      That the Court certify this lawsuit as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged herein;

D.      That the Court award Plaintiff and the Class treble damages against Defendants for their violations of federal antitrust laws, plus interest;

E.      That the Court award monetary losses suffered by Plaintiff and Class Members that were in contractual or quasi-contractual relationships with a Defendant or an affiliate thereof;

F.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

G.      That the Court direct such further relief it may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial for all issues triable by a jury.

41

Dated: May 27, 2016

**BERNSTEIN LITOWITZ BERGER &**
**GROSSMANN LLP**

_/s/ Blair A. Nicholas__
Blair A. Nicholas
Benjamin Galdston
David Kaplan
Lucas Gilmore
Brandon Marsh
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Tel: (858) 720-3183
Fax: (858) 793-0323
blairn@blbglaw.com
benjaming@blbglaw.com
davidk@blbglaw.com
lucasg@blbglaw.com
brandonm@blbglaw.com

**HAUSFELD LLP**

_/s/ Scott Martin__
Scott Martin
33 Whitehall Street
14th Floor
New York, NY 10004
Tel: (646) 357-1100
Fax: (212) 202-4322
smartin@hausfeld.com

Michael D. Hausfeld
William B. Butterfield
Swathi Bojedla
**HAUSFELD LLP**
1700 K Street NW
Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeld.com
wbutterfield@hausfeld.com
sbojedla@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Christopher L. Lebsock
**HAUSFELD LLP**
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeld.com
bsweeney@hausfeld.com
clebsock@hausfeld.com

*Attorneys for Plaintiff*